First Division
June 4, 2007

No. 1-06-0768

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 98 CR 22970 |
| | ) | |
| ANTHONY CLARK, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Henry R. Simmons, |
| | ) | Judge Presiding |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

In March 2000, defendant, Anthony Clark, was convicted of the June 1998 first-degree murder of Isaac Soberon. The trial court sentenced defendant to a term of 46 years. On direct appeal, this court affirmed defendant's conviction and sentence. See People v. Clark, 1-00-2022 (March 29, 2002) (unpublished order pursuant to Supreme Court Rule 23).

In November 2003, defendant filed his first amended postconviction petition alleging that: (1) his right to representation by conflict-free counsel was violated; (2) the trial court was required to conduct a hearing on defendant's pretrial *pro se* motion for appointment of counsel other than the public defender; (3) defendant was denied his constitutional right to effective assistance of counsel at the sentencing hearing; and (4) defendant was denied effective assistance of appellate counsel. The State filed a motion to dismiss defendant's postconviction petition. In May 2004, the trial court dismissed counts I, II and IV, but granted a hearing as to defendant's claim regarding effective assistance of counsel at the sentencing hearing. At the October 2004 hearing on that count, the trial court granted defendant a new sentencing hearing. The trial court

conducted the new sentencing hearing in November 2005, at which defendant presented several witnesses in mitigation. Following the hearing, the trial court sentenced defendant to a term of 44 years' imprisonment. Defendant appeals the partial dismissal of his first amended postconviction petition as well as his sentence.

In August 1998, defendant was indicted for the first degree murder of Isaac Soberon. Assistant Public Defender Patrick Moriarty from the Cook County public defender's dffice was appointed to represent defendant. Codefendants in the case were also represented by assistant public defenders from the Cook County public defender's office. Defendant was not tried jointly with any of his codefendants.

On June 29, 1999, Assistant Public Defender Marijane Placek successfully sought to withdraw as counsel for codefendant Matthew Hamill. Placek told the trial court that there could be a potential conflict if the State intended to call Jose Ahumada as a witness. Ahumada was represented by another assistant public defender, Ann Collins, on unrelated charges. Placek informed the court that Ahumada would testify that he accompanied Hamill's brother in hiding the vehicle involved in the shooting. Ahumada would also state that he had been told that defendant fired the fatal shots. Additionally, Collins was listed as a potential witness. The trial court found that the simultaneous representation of a defendant and a potential witness gave rise to a potential conflict. A private attorney was appointed to represent Hamill in July 1999.

In September 1999, defendant filed a *pro se* motion for appointment of counsel other than the public defender, in which he contended that (1) he did not have any meaningful line of communication with his attorney, (2) his calls to his attorney had not been accepted, (3) defense

counsel did not return the calls from defendant's family and friends, (4) defense counsel urged defendant to accept a plea, (5) defense counsel failed to fully investigate the case, and (6) defense counsel failed to contact potential witnesses. At the hearing on the motion, defendant admitted his claim that his calls were not accepted by his attorney was false. Defense counsel stated that he had given defendant his phone number, but had not received any calls. Defendant claimed that he did not have the phone number. The trial court told defendant that his attorney did a competent and commendable presentation at a Rule 402 conference a month earlier. 177 Ill. 2d R. 402. The trial court found defendant's motion to be without merit and frivolous and there was no need to appoint a new attorney.

The following evidence was presented at defendant's March 2000 trial.

Joseph DeClet testified that on the night of June 24 and into June 25, 1998, he was a passenger in a car with Soberon, Michael Kowalski and Khaled El-Helo. El-Helo was driving a 1993 Cutlass Supreme convertible with the top down. Soberon was in the front passenger seat and DeClet was behind Soberon and Kowalski behind El-Helo. They were driving to a friend's house near the 5400 block of Campbell Street in Chicago. When they got to the area of Campbell and Balmoral, DeClet saw two or three men on the street. The men approached the car and called out, "What's up, folks?" DeClet stated that he told the men they were not in a gang and to leave them alone. The car turned onto Balmoral and two more men came out of the bushes. DeClet saw a flash and heard gunshots. He saw a person coming toward the car and firing a gun at them. DeClet identified defendant as the shooter in a photo array, a lineup and in court.

DeClet said they pulled into an alley to see who was hurt. DeClet said there was lots of blood in the car and they soon realized Soberon had been shot in the head. They drove off and found an ambulance at a nearby 7-11 convenience store. Soberon was taken to the hospital and died later that day. Kowalski also testified to the same facts except he was unable to see the gunman's face, but he did identify Rafael Hernandez, one of defendant's codefendants, as one of the men he saw come out of the trees.

Joseph Bembynista, a forensic investigator with the Chicago police department, testified that he recovered five cartridge casings from a .25-caliber Winchester semiautomatic handgun at the scene. Dr. Thamrong Chira performed the autopsy on Soberon. Dr. Chira said the death was caused by a gunshot wound to the head and the manner of death was homicide. Dr. Chira recovered a small copper-jacketed bullet from Soberon's brain. The gunshot was not fired at close range. The parties stipulated that a ballistics expert, if called to testify, would state that the bullet recovered from Soberon was a .25-caliber bullet.

Officer Paul Zucharias testified that he is a Chicago police officer and an expert on Chicago street gangs. He explained that Latin Kings identify themselves as "people," and the Insane Popes classify themselves as "folks." He also stated that sometimes gang members engaged in "false flagging," in which they would identify themselves as members of a rival gang in order to get other gang members to reveal their affiliation.

Detective Robert Ellmore testified that he is a detective in the Area 3 violent crimes unit of the Chicago police department. Detective Ellmore stated that in July 1998, he had a conversation with Christopher Hamill about the shooting death of Soberon. Hamill provided

information that led to the arrest of Christopher's brother Matthew and Rafael Hernandez. After speaking with Matthew Hamill and Hernandez, Detective Ellmore began to look for Charlie Khio and defendant.

Detective Stephen Schorsch testified that he is a detective with Area 3 of the Chicago police department. He stated that he learned from another police officer that defendant was staying at the home of a family friend in East Chicago, Indiana. Detective Schorsch went there to arrest defendant. Defendant agreed to surrender himself to the police. Defendant was held at the police station in East Chicago, Indiana, until he could be extradited to Chicago.

Detective Schorsch gave defendant his Miranda rights, which defendant waived and agreed to speak with Detective Schorsch. Defendant admitted that he was involved in the shooting. He agreed to give a written statement to Assistant State's Attorney (ASA) Carmen Aguilar. Detective Schorsch further testified that defendant agreed to go with him to the crime scene, where he pointed out his route on the night of the shooting. Defendant told Detective Schorsch that the shooting occurred after he, Matthew Hamill, Khio and Hernandez, all members of the Latin Kings, discussed avenging the death of a fellow gang member who was killed by the Insane Popes. The men went to the area around Balmoral and Campbell, which was Insane Popes territory, to find an Insane Popes member to kill. Hamill obtained a semiautomatic handgun, gave it to defendant and told him to wait. Hamill and Khio waited on the street corner while defendant hid between some bushes and a building.

Eventually, defendant saw a white convertible driving on Campbell Street and Hernandez shouted "we got some." Defendant told Detective Schorsch that he fired three shots over the top

5

of the car while defendant was crouched down. Hamill ordered defendant to keep shooting so defendant ran down the street toward the convertible and fired three more shots. Defendant and the others fled. Defendant told Detective Schorsch he hid the gun in some bushes, but when defendant took Detective Schorsch to that location, the gun was not there.

ASA Aguilar testified that she took defendant's statement at the police station in East Chicago, Indiana. She read defendant's statement into the record, which contained essentially the same facts as Detective Schorsch's testimony. The statement also indicated that defendant was 18 years old at the time of the shooting. Defendant also explained that Hamill was a "cosinca" in the Latin Kings, which meant that he was second in command, and Hernandez was a "chief enforcer," who is someone authorized to give orders.

The State rested after ASA Aguilar's testimony. Defendant moved for a directed finding, which the trial court denied.

Defendant presented the testimony of Alma Perez and her sister Melissa Perez. Alma stated that defendant was at her house the night of the shooting. She recalled this more than a year after the shooting. She remembered those dates specifically because her son's birthday was a couple of days later and they had been preparing for a party. She admitted that she never came forward to the court until that the day of her testimony. Alma also stated that she was very good friends with the Latin Kings' member who had been killed by the Insane Popes.

Melissa stated that she is the mother of defendant's child. She said she did not remember that defendant was at her house on the night of the shooting until her sister refreshed her memory in late 1999.

Following closing arguments, the jury found defendant guilty of the first degree murder of Soberon. At a subsequent sentencing hearing, the trial court sentenced defendant to 46 years in prison. Defense counsel did not present any witnesses in mitigation and only asked the court to consider defendant's age, lack of prior felony convictions and potential for rehabilitation.

On direct appeal, defendant raised two issues: he claimed the State made improper references to Soberon's family during closing arguments and the trial court abused its discretion in sentencing. This court affirmed defendant's conviction and sentence.

In November 2003, defendant filed his first amended postconviction petition. Defendant argued that: (1) his right to representation by conflict-free counsel was violated; (2) the trial court was required to conduct a hearing on defendant's pretrial *pro se* motion for appointment of counsel other than the public defender; (3) defendant was denied his constitutional right to effective assistance of counsel at the sentencing hearing; and (4) defendant was denied effective assistance of appellate counsel. As to the first claim, defendant contended that his trial counsel should have filed a motion to withdraw because defense counsel was from the Cook County public defender's office and that the same conflict present in Matthew Hamill's case existed in his case. Defendant asserted that the conflict was even more profound in his case because the Cook County public defender represented multiple codefendants and a witness who gave a statement implicating defendant.

The State filed a motion to dismiss, and after hearing arguments from both sides, the trial court dismissed the claims relating to the conflict of interest, attorney negligence and ineffective assistance of appellate counsel. The trial court noted that Placek and Collins were in the murder

task force unit of the Cook County public defender's office, whereas defendant's trial counsel was in the separate multiple defendant unit. The court concluded that there was no conflict in defendant's case.

The trial court denied the State's motion to dismiss on the claim of ineffective assistance of trial counsel at sentencing and granted a hearing. Following the hearing, the trial court ordered a new sentencing hearing because defense counsel failed to call several available witnesses in mitigation.

At the November 2005 sentencing hearing, the State presented an impact statement from Soberon's mother as well as presentence investigation reports. Defendant presented the testimony of several family members and friends through live testimony and affidavits. Defendant also called Dorothy Papchristos, a gang specialist who knew defendant, and Dr. Ruben Gur, a neuropsychologist and professor at the University of Pennsylvania.

Defendant's family and friends testified that defendant was not a typical gang member. They discussed his devotion to his family and his efforts to keep his younger siblings and friends from joining a gang. They said that defendant regretted joining a gang, but feared leaving because of the retaliation against himself and his family. Defendant left the neighborhood twice in an effort to distance himself from the gang. Once he moved to Florida to live with his grandmother, and then later he participated in the Lincoln's Challenge, a program for troubled youth. Defendant earned his GED while in the program. Papachristos testified about the hierarchy of gangs and that it was a reasonable for defendant to fear retaliation. Papachristos also stated that defendant could have been killed for violating a direct order from Hamill, a "cosinca."

Dr. Gur testified about adolescent brain development and that an adolescent is not as culpable for his actions as an adult with a fully developed brain.

The trial court found that Dr. Gur's testimony had very little value because Dr. Gur never examined defendant as an adolescent. Instead, the court said that Dr. Gur's testimony was not supported by the testimony of defendant's friends and family, who described him as a mature, responsible and respectful adolescent. The court found that defendant made the decision to join the gang and to get tattoos to evidence his affiliation. The court considered the gang influence, but noted that defendant did not experience any repercussions when he left to live with his grandmother and to attend Lincoln's Challenge. The court concluded that defendant needed a structured environment for a long time. The trial court then sentenced defendant to 44 years' imprisonment. The trial court denied defendant's motion to reconsider sentencing.

This appeal followed.

On appeal, defendant argues that the trial court erred in dismissing his first amended postconviction petition and failed to fully consider the mitigating evidence presented at defendant's sentencing hearing.

Before we consider the merits of defendant's appeal, we must consider our jurisdiction. One week before oral argument, the State filed a motion contesting this court's jurisdiction over three of the four issues raised by defendant. The State contends that under Supreme Court Rule 606(b) (210 Ill. 2d R. 606(b)), defendant was required to file his notice of appeal within 30 days of the trial court's October 27, 2004, order granting a new sentencing hearing because that order disposed of the final remaining issue on defendant's postconviction petition. According to the

State, defendant's notice of appeal filed March 10, 2006, only preserves the appeal of the February 10, 2006, sentencing order and we should dismiss the issues from defendant's dismissed postconviction claims.

Section 122-7 of the Illinois Post-Conviction Hearing Act (Post-Conviction Act) states that "[a]ny final judgment entered upon [a postconviction] petition shall be reviewed in a manner pursuant to the rules of the Supreme Court." 725 ILCS 5/122-7 (West 2004). This jurisdiction question was addressed by the Second District in People v. Fikara, 345 Ill. App. 3d 144 (2003). In Fikara, the trial court dismissed four allegations in the defendant's postconviction petition and granted a new sentencing hearing based on a claimed Apprendi violation. Fikara, 345 Ill. App. 3d at 150. As in the instant case, the defendant did not file his notice of appeal until after his new sentencing hearing. Fikara, 345 Ill. App. 3d at 151. The State argued that the reviewing court did not have jurisdiction to consider the issues raised from the dismissed counts in the postconviction petition because the notice of appeal was not timely filed. Fikara, 345 Ill. App. 3d at 151.

The Fikara court, relying on People v. Scott, 194 Ill. 2d 268, 278-79 (2000), and People v. Joyce, 1 Ill. 2d 225, 227 (1953), pointed out that "Illinois courts have held that an order that disposes entirely of a postconviction petition is immediately appealable, even if the order does not ultimately dispose of the criminal proceedings against the defendant." Fikara, 345 Ill. App. 3d at 151. In Scott, the supreme court found that when the trial court grants a new sentencing hearing from a postconviction petition, the State is allowed to immediately appeal that order. Scott, 194 Ill. 2d at 278-79. The Scott court noted that if an appeal was not permitted until after

the new sentencing hearing, then the State would be denied its right to seek review of the trial court's decision. Scott, 194 Ill. 2d at 279. The same analysis follows in cases like Fikara and the present case, in that, if the State is permitted to appeal a final order, then the defendant should do so as well. "Such an order, while not necessarily disposing of the criminal proceeding, nonetheless is a final disposition of the petition under the Act." Fikara, 345 Ill. App. 3d at 151-52, citing Joyce, 1 Ill. 2d at 227. The reviewing court in Fikara found that the trial court's order dismissing the postconviction petition in part and granting a new sentencing hearing "resolved all issues raised in the postconviction petition and was a final disposition of the petition under the Act." Fikara, 345 Ill. App. 3d at 152. Accordingly, that order was immediately appealable and the defendant was required to file a notice of appeal within 30 days. Fikara, 345 Ill. App. 3d at 152. The court found the defendant's failure to file a timely notice of appeal deprived it of jurisdiction. Fikara, 345 Ill. App. 3d at 152.

However, the Fikara court supplemented its opinion upon denial of rehearing. In the supplemental opinion, the court considered the defendant's assertion that the trial court failed to order the clerk of the circuit court to provide the defendant with immediate notice of the adverse judgment as required by Supreme Court Rule 651(b) (134 Ill. 2d R. 651(b)) and that this failure should excuse his untimely notice of appeal. Fikara, 345 Ill. App. 3d at 157-58. "Supreme Court Rule 651(b) requires that, upon the entry of a judgment adverse to a defendant in a postconviction proceeding, the clerk of the trial court 'shall at once mail or deliver' to the defendant a notice advising him of the entry of the order and advising him of his right to appeal." Fikara, 345 Ill. App. 3d at 158, quoting 134 Ill. 2d R. 651(b). The reviewing court reviewed the

record and concluded that the clerk of the trial court failed to provide the defendant with the required notice of the adverse judgment and the trial court also failed to admonish the defendant about the finality of the order and the need to file a notice of appeal within 30 days. Fikara, 345 Ill. App. 3d at 158.

The Second District noted that in cases where the requirements of Rule 651(b) have not been satisfied, "the reviewing court must treat a defendant's untimely notice of appeal as a petition for leave to file a late notice of appeal within the contemplation of Supreme Court Rule 606(c) (188 Ill.2d R. 606(c))." Fikara, 345 Ill. App. 3d at 158. "The reviewing court must then grant the petition and consider the merits raised in the defendant's appeal." Fikara, 345 Ill. App. 3d at 158. "The reviewing court must allow the filing of a late notice of appeal even when the six-month period for seeking leave to file a late notice of appeal provided in Rule 606(c) [188 Ill. 2d R. 606(c)] has already expired." Fikara, 345 Ill. App. 3d at 158. The Fikara court held that in light of the trial court's failure to "ensure compliance" with Rule 651(b), the reviewing court must treat the untimely notice of appeal as a petition to file a late notice of appeal and consider the merits of the defendant's postconviction claims. Fikara, 345 Ill. App. 3d at 158.

We find the decision in Fikara to be well reasoned and agree with its analysis. Here, the trial court initially dismissed three of the four claims in defendant's postconviction petition and ordered an evidentiary hearing on defendant's sentencing claim. After the evidentiary hearing, the trial court granted defendant a new sentencing hearing, thus resolving the final claim from the postconviction petition. Defendant then failed to file a notice of appeal within 30 days of that October 27, 2004, order in which the trial court disposed of all claims from the postconviction

petition. However, based on our reading of the record on appeal, the clerk of the trial court failed to comply with Rule 651(b). The clerk of the circuit court failed to give defendant the required notice of an adverse judgment under Rule 651(b). Additionally, the trial court did not admonish defendant about his right to appeal until its ruling at defendant's sentencing hearing. As in Fikara, we must treat defendant's untimely notice of appeal as petition to file a late notice of appeal and consider the issues defendant has raised from the dismissed portion of his postconviction petition.

The Post-Conviction Act (725 ILCS 5/122-1 through 122-8 (West 2000)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2000); People v. Coleman, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. Coleman, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." People v. Evans, 186 Ill. 2d 83, 89 (1999). " The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." People v. Barrow, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. Barrow, 195 Ill. 2d at 519. However, the doctrine of waiver is relaxed where the alleged waiver stems from the incompetence of appellate counsel. People v. Harris, 206 Ill.

2d 1, 33 (2002). The standard of review for dismissal of a postconviction petition is *de novo*. Coleman, 183 Ill. 2d at 389.

At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2002). If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2002). If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2002)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2002)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See Coleman, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2002).

"A defendant is not entitled to an evidentiary hearing on a post[]conviction petition as a matter of right." Barrow, 195 Ill. 2d at 519. "An evidentiary hearing is warranted on a postconviction petition only where the allegations of the petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated." People v. Orange, 195 Ill. 2d 437, 448 (2001). "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in

14

accompanying affidavits are taken as true." Orange, 195 Ill. 2d at 448.

Defendant first contends that the trial court erred in dismissing his claim that his right to conflict-free counsel was violated. Defendant asserts that his trial counsel labored under a conflict of interest because his attorney was from the public defender's office, which also represented defendant's codefendants and a potential witness. The trial court was made aware of the potential conflict when the assistant public defender representing one of defendant's codefendants sought to withdraw due to a potential conflict of interest. Defendant later filed a *pro se* motion seeking new counsel and included a claim that the continued representation would evince "an absolute conflict of interest." However, the *pro se* motion did not discuss the conflict of interest in any detail. Defendant claims that the trial court was obligated to conduct an inquiry as to any conflict in defendant's case.

A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. People v. Hardin, 217 Ill. 2d 289, 299 (2005); People v. Morales, 209 Ill. 2d 340, 345 (2004). In People v. Spreitzer, 123 Ill. 2d 1, 14-17 (1988), the Illinois Supreme Court outlined the framework for considering conflict of interest cases. Specifically, the court noted the dichotomy between *per se* conflicts and alleged conflicts. A *per se* conflict of interest exists where "certain facts about a defense attorney's status were held to engender, *by themselves*, a disabling conflict." (Emphasis in original.) Spreitzer, 123 Ill. 2d at 14. When a *per se* conflict of interest is shown, a defendant is not required to show prejudice resulting from the conflict in order to obtain relief. Spreitzer, 123 Ill. 2d at 15. A *per se* conflict is grounds for reversal unless the defendant waived his right to conflict-free counsel. Spreitzer, 123 Ill. 2d at

15

17. The supreme court has found a *per se* conflict when (1) defense counsel had a contemporaneous relationship with the victim, the prosecution, or an entity assisting the prosecution (People v. Lawson, 163 Ill. 2d 187, 211 (1994) (collecting cases)), (2) defense counsel contemporaneously represented a prosecution witness (People v. Thomas, 131 Ill. 2d 104, 111 (1989)), and (3) defense counsel was a former prosecutor who had been personally involved in the prosecution of the defendant (Lawson, 163 Ill. 2d at 217-18).

In the second class of alleged conflicts, reversal is not automatic and sometimes courts have refused to reverse a conviction without some showing that conflict actually affected the attorney's performance. Spreitzer, 123 Ill. 2d at 17. These types of conflicts have often involved joint or multiple representation of codefendants. Spreitzer, 123 Ill. 2d at 17. "Treating multiple representation as creating a *per se* conflict would put an end to multiple representation altogether, since a 'possible conflict inheres in almost every instance of multiple representation,' and a *per se* rule would 'preclude multiple representation even in cases where "[a] common defense *** gives strength against a common attack." ' " Spreitzer, 123 Ill. 2d at 17, quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 346, 100 S. Ct. 1708, 1718 (1980), quoting Glasser v. United States, 315 U.S. 60, 92, 86 L. Ed. 680, 710-11, 62 S. Ct. 457, 475 (1942) (Frankfurter, J., dissenting).

The analysis of an alleged conflict depends on when the issue was raised before the trial court. If the potential conflict is brought to the attention of the trial court by counsel at an early stage, a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel.

16

1-06-0768

Spreitzer, 123 Ill. 2d at 18; Holloway v. Arkansas, 435 U.S. 475, 484, 55 L. Ed. 2d 426, 434, 98 S. Ct. 1173, 1178 (1978). "While this rule is not *per se* (since it is the attorney's contemporaneous allegations of a conflict and not the mere presence of multiple representation which gives rise to the trial court's duty), reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict. In this sense, reversal for the trial court's failure to alleviate possible or potential conflicts does not require a showing of 'specific prejudice.' " Spreitzer, 123 Ill. 2d at 18; quoting Holloway, 435 U.S. at 487, 55 L. Ed. 2d at 436, 98 S. Ct. at 1180.

"However, if the trial court is not apprised of the potential conflict, then reversal of the conviction will only be had upon a showing that 'an actual conflict of interest adversely affected' counsel's performance." Spreitzer, 123 Ill. 2d at 18, quoting Cuyler, 446 U.S. at 350, 64 L. Ed. 2d at 348, 100 S. Ct. at 1719. "[T]he defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." Spreitzer, 123 Ill. 2d at 18. "While mere speculative or hypothetical conflicts are insufficient to demonstrate [an] actual conflict of interest [citation], a defendant need not prove the conflict contributed to his conviction [citation]." People v. White, 362 Ill. App. 3d 1056, 1060 (2005).

Here, defendant claims that a *per se* conflict exists in this case because the public defender's office represented codefendants and Ahumada, a potential witness against defendant. Ahumada's public defender was also listed as a potential witness by the State. Defendant also asserts that a *per se* conflict exists when counsel represents multiple defendants who are pursuing antagonistic defenses, but the case relied on for this contention, People v. Simmons, 67 Ill. App.

17

3d 1045 (1978), predated the supreme court's decision in <u>Spreitzer</u>, which clarified the situations creating a *per se* conflict of interest, and the reviewing court in <u>Simmons</u> found the conflict issue to be waived. Moreover, this case does not involve antagonistic defenses. "Defenses are antagonistic when each codefendant implicates the other in the offense and professes his own innocence." <u>People v. McCann</u>, 348 Ill. App. 3d 328, 335 (2004). Here, codefendants gave statements to the police that implicated defendant, but none of the codefendants were tried jointly with defendant nor did they testify at defendant's trial. These facts distinguish this case from cases that successfully raised the presence of antagonistic defenses as the basis for a conflict of interest. See <u>White</u>, 362 Ill. App. 3d at 1061 (actual conflict of interest was shown where attorney represented codefendants tried together and cross-examined a witness to benefit one codefendant at the expense of the other).

Defendant argues that the representation of codefendants and a potential witness by the public defender and the inclusion of an assistant public defender as a potential witness gave rise to a *per se* conflict of interest. Defendant implies in his argument that because a conflict of interest existed for codefendant Hamill, a conflict of interest existed for him as well. Defendant further asserts that the trial court received notice of the conflict in defendant's case when codefendant Hamill's public defender raised her conflict claims and was therefore required to perform an inquiry as to how the conflict affected defendant. Defendant relies on <u>Spreitzer</u> and <u>Holloway</u>, to support his assertion that the trial court was obligated to consider whether a conflict of interest existed in his case.

We find the supreme court's decision in <u>Morales</u> to be instructive. In <u>Morales</u>, the court

18

reversed the appellate court's finding of a *per se* conflict of interest when the defendant's attorney also represented a prosecution witness. The reviewing court found that since the witness represented by defendant's attorney never testified at trial, defense counsel never assumed the role of attorney for a prosecution witness and declined to find a *per se* conflict. Morales, 209 Ill. 2d at 346. The supreme court further explained that nothing in the record indicated that the witness stood to gain anything in a verdict against the defendant. Morales, 209 Ill. 2d at 346-47.

In the instant case, none of defendant's codefendants, Ahumada, or his attorney testified at defendant's trial. Nothing was presented at defendant's trial that implicated the public defender's office as representing conflicting interests. Based on the supreme court's decision in Morales, we find that there was no *per se* conflict of interest since at defendant's trial the only interest represented by the public defender's office was defendant's.

Additionally, in Morales, the supreme court clarified its holding in Spreitzer that a trial court has a duty to either appoint separate counsel or take adequate steps to ascertain whether the risk of conflict was too remote to apply only when *defense counsel* informs the court of the potential conflict. Morales, 209 Ill. 2d at 347-48. The Morales court noted that the United States Supreme Court confirmed that the rule in Holloway of automatic reversal applies only when a trial court fails to respond appropriately to defense counsel's objection to a representation. Mickens v. Taylor, 535 U.S. 162, 168, 152 L. Ed. 2d 291, 302, 122 S. Ct. 1237, 1241-42 (2002). The Morales court declined to apply Holloway in that instance because neither defense counsel nor defendant raised the potential conflict. Morales, 209 Ill. 2d at 348.

It is undisputed that defendant's trial counsel did not raise a potential conflict of interest

before the trial court, but defendant asserts that the trial court should have conducted an inquiry in defendant's case based on the conflict issue raised in codefendant Hamill's case. Additionally, defendant contends that he raised the issue before the trial court in his *pro se* motion for appointment of counsel other than the public defender. The only mention of a conflict of interest was:

> "Defendant avers that his rights have been and shall continue to be substantially harmed and prejudiced by the continued representation of appointed counsel, evincing an absolute conflict of interest [citations omitted] in order to receive meaningful and effective assistance and zealous advocacy of counsel."

Defendant did not assert any facts relating to a conflict of interest. The mere mention of "an absolute conflict of interest" was not sufficient to make the trial court aware of any conflict as it relates to defendant. In the context of a potential conflict between two public defenders, the conflict issue will normally be raised by the defendant. Hardin, 217 Ill. 2d at 303. Consequently, the defendant needs only to present the gist of such a conflict. "The defendant must sketch, in limited detail, a picture of how the working relationship between the public defenders created an appearance of impropriety." Hardin, 217 Ill. 2d at 303. "Relevant factors include whether the two public defenders were trial partners in the defendant's case [citations]; whether they were in hierarchical positions where one supervised or was supervised by the other [citations]; or whether the size, structure, and organization of the office in which they worked affected the closeness of

20

any supervision [citations]." <u>Hardin</u>, 217 Ill. 2d at 303. Even though the threshold is low, defendant's *pro se* motion makes no mention of what conflict of interest existed and does not discuss his codefendants or the public defender's office's multiple representations. Based upon these facts, defendant did not raise the gist of a claim of a conflict of interest.

Moreover, defendant has not cited any authority to support his assertion that the trial court was obligated to conduct an inquiry in defendant's case based on the conflict of interest raised in codefendant Hamill's case. Nothing in <u>Holloway</u> and <u>Spreitzer</u> requires a trial court to *sua sponte* conduct an inquiry in a defendant's case based on motions brought in a codefendant's case. In addition, the Illinois Supreme Court has held that "in determining whether a conflict of interest exists, individual attorneys who comprise the staff of the public defender, unlike members of a private law firm, are not members of an entity, 'which should be subject to the rule that if one attorney is disqualified by reason of a conflict of interest then no other member of the entity may continue with the representation.' " <u>People v. Brown</u>, 172 Ill. 2d 1, 44 (1996), quoting <u>People v. Robinson</u>, 79 Ill. 2d 147, 159 (1979). In cases involving the public defender's office, the trial court must conduct a case-by-case inquiry to determine whether the risk of a conflict colored the defendant's representation, but only when the potential conflict is brought to the court's attention. <u>Hardin</u>, 217 Ill. 2d at 302; see also <u>People v. Banks</u>, 121 Ill. 2d 36 (1987).

Based on the foregoing analysis, we find that a potential conflict relating to defendant's representation by the public defender's office was not brought to the attention of the trial court before trial, and therefore, the trial court was not obligated to conduct an inquiry.

Next, we look to see if defendant has alleged any defect in his representation attributable

21

to the conflict. Under Spreitzer, reversal of the conviction will only be had upon a showing that an actual conflict of interest adversely affected counsel's performance and defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict. Spreitzer, 123 Ill. 2d at 18. Here, defendant has not alleged any defect in his trial counsel's performance related to the potential conflict of interest. Accordingly, we find that defendant has not shown that his trial counsel labored under an actual conflict of interest that adversely affected his performance.

Defendant next argues that the existing Illinois Supreme Court case law for examining conflicts within the public defender's office differently than a law firm violated defendant's equal protection. We need not review defendant's equal protection argument because defendant lacks standing to raise it. Standing in Illinois requires only some injury in fact to a legally cognizable interest. Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462, 492 (1988). Since we have found that defendant was not deprived of his right to conflict-free representation, he " 'is not aggrieved by the alleged deprivation of equal protection and consequently lacks standing to raise this issue.' " People v. Campa, 217 Ill. 2d 243, 268 (2005); quoting People v. Boykin, 94 Ill. 2d 138, 147 (1983).

Next, defendant asserts that the trial court did not make an adequate inquiry into his *pro se* claim that his trial counsel was neglecting his case. The State maintains that the trial court conducted an adequate inquiry into defendant's motion, and the trial court properly dismissed this postconviction claim.

The following discussion took place when the trial court considered defendant's *pro se*

22

1-06-0768

motion:

> "THE COURT: You're telling me that your phone calls are not accepted at the Public Defender's office?
>
> THE DEFENDANT: Well–
>
> THE COURT: That's what this says. Number three says, the defendant's phone calls have not been accepted by that office. Is that what you are saying?
>
> THE DEFENDANT: Well, I– (inaudible)
>
> THE COURT: So that's not true, right?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: So, point number three, part of it is not true. I'll scratch it off. His phone number is available. Your phone number is available to him, is that correct? You have voice mail?
>
> MR. MORIARTY [Defendant's attorney]: Yes.
>
> THE COURT: Has he ever called you?
>
> MR. MORIARTY: No.
>
> THE COURT: You gave him that phone number, right?
>
> MR. MORIARTY: Yes, sir.
>
> THE DEFENDANT: Sir, I never got a phone number from him to call him.
>
> THE COURT: Did you call anyone in the Public

Defender's Office?

THE DEFENDANT: I never had a number.

THE COURT: I'm quite certain that his phone number is available in the County Jail, and it's easily attainable, and you could have called if you needed to contact your lawyer.

You could have called the Public Defender's office, and they would give you Mr. Moriarty's phone number, if it is in fact true that you don't have his phone number.

THE DEFENDANT: Out of all due respect to Mr. Moriarty, I need to find out what's going on with my case, you know, and he really doesn't tell me anything that I need to know, you know.

THE COURT: Well, we had an extensive conference back in August, August 11th. I made an offer. And all I can tell you is that your attorney represented you during that conference, and spoke up on your behalf, and did a competent and commendable presentation during that conference.

THE DEFENDANT: I didn't really want to go into the 402 conference. It was a mistake.

THE COURT: Well, I asked you, and you said you did. So maybe now you are having afterthoughts about it, and I respect

that. But you never — I asked you particular questions, and you said you wanted me to discuss the case.

In any event, I have read through your motion, and I find it to be without merit and frivolous.

Mr. Moriarty has practiced before me many years. He's well experienced. He used to be a Chicago police officer. He's been a lawyer for many years and there's nothing in here that tells me that he's not doing anything but his job. And he's more than happy to meet with you and discuss your case with you.

I'm not going to appoint anyone outside of the Public Defender's office to represent you. So now, if they want to change the attorneys to the Multiple Defendants' unit and give you a different lawyer, that's up to them, but I'm not going to appoint somebody outside of the Public Defender's office to represent you. So, your motion is denied."

Defendant cites to the supreme court decision in People v. Moore, 207 Ill. 2d 68 (2003), for support. In Moore, the defendant filed a *pro se* motion for appointment of new counsel with the trial court during pretrial discovery and then after trial filed a second *pro se* motion seeking new counsel. Moore, 207 Ill. 2d at 76-77. The trial court's only response to the defendant's posttrial motion was to appoint the State Appellate Defender as counsel on appeal. Moore, 207 Ill. 2d at 77.

1-06-0768

The supreme court held that when a defendant files a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must conduct an inquiry into the factual basis of the claim. Moore, 207 Ill. 2d at 78. "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." Moore, 207 Ill. 2d at 78. "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." Moore, 207 Ill. 2d at 78. The evaluation can include asking the trial counsel questions to explain the facts and circumstances of the motion and a brief discussion between the trial court and the defendant. Moore, 207 Ill. 2d at 78. Also, the trial court can base its evaluation of the ineffective assistance claims on its observations of the defendant's attorney at trial and the insufficiency of the defendant's allegations on its face. Moore, 207 Ill. 2d at 79.

Here, we find that the trial court conducted a sufficient inquiry into the allegations in defendant's *pro se* motion. The trial court inquired into the preparation of the motion with defendant and also asked about defendant's claim that his trial counsel would not accept his calls. Defendant then admitted that allegation was false. The trial court indicated on the record that it found defendant's motion to be without merit based in part on its observations of defense counsel's representation of defendant during the Rule 402 conference. These observations of defendant's attorney's performance are part of a proper evaluation under Moore. Additionally, at the hearing on defendant's postconviction petition, the trial court further explained its

26

considerations of defendant's *pro se* motion. The court noted that "the most compelling part of the inquiry" was that in response to the first question asked of defendant, defendant admitted that he lied. The court also stated that defendant's "claims basically were of a general nature, that his attorney wouldn't talk to him, he calls him, wouldn't accept his phone calls and he only talked to him in the bull pen." The court said that defendant made those allegations and then later admitted that petitioner never called his attorney, saying his attorney never gave defendant his phone number. The trial court weighed defendant's allegations, in which he admitted to fabricating in part, against its knowledge of defense counsel's performance in the case, and concluded that the *pro se* motion was without merit. We find that the trial court properly considered defendant's *pro se* motion and made a decision based on its evaluations. Accordingly, the trial court properly dismissed this issue in defendant's postconviction petition.

Defendant's last argument on appeal is that the trial court abused its discretion in sentencing defendant to 44 years' imprisonment on his first degree murder conviction. Defendant asserts that the trial court failed to give proper weight and consideration to the mitigating evidence presented at his sentencing hearing. The State maintains that the trial court did not abuse its discretion because defendant's sentence is within the statutory limits and the trial court properly considered the aggravating and mitigating factors in sentencing.

"Although the legislature has prescribed the permissible ranges of sentences, great discretion still resides in the trial judge in each case to fashion an appropriate sentence within the statutory limits." People v. Fern, 189 Ill. 2d 48, 53 (1999). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors

as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. Fern, 189 Ill. 2d at 53." "The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' " Fern, 189 Ill. 2d at 55, quoting People v Barrow, 133 Ill. 2d 226, 281 (1989). "In reviewing a claim that a sentence within statutory limits is excessive, the court must consider whether, given the particular facts of the case, the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." Fern,189 Ill. 2d at 55-56. Supreme Court Rule 615(b)(4) allows a reviewing court to reduce a sentence imposed by the trial court where the record discloses that the trial court abused its discretion. 134 Ill. 2d R. 615(b)(4).

Under section 5-8-1 of the Unified Code of Corrections, the sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). Defendant received a sentence of 44 years, which is within the statutory range. The crux of his argument is that the trial court did not consider the mitigating evidence because he only received a sentence that was two years less than his previous sentence. Defendant presented the live testimony of several family members and friends as well as two expert witnesses and several affidavits.

Mayra Ramos and her children Kristian Tellado and Jessica Flores testified on defendant's behalf. Tellado testified that he and defendant are like "brothers." Tellado and Flores met defendant when Tellado moved into the neighborhood. Flores stated that defendant came by to help them move. Flores testified that she dated defendant for a while. Flores said

that defendant asked her mother's permission to date Flores. Defendant spent a lot of time at the family's house. Ramos said that defendant called her "Mom." When defendant spent the night at their house, defendant slept on the couch or in the boys' room. Tellado and defendant worked together at Wrigley Field concessions. All of them described defendant as respectful, especially toward Ramos. Flores stated that defendant would help her babysit and would clean her house. Ramos said that defendant treated her children like brothers and sisters. Flores would also help defendant babysit his younger siblings. She said he took care of his younger siblings and made sure they did not get into trouble.

Tellado and Flores described the neighborhood as having a strong gang presence. Tellado saw gang members "all day, every day." Tellado and Flores did not know defendant was in a gang when they first met. Tellado later asked defendant if he was in a gang. Tellado was surprised and disappointed because defendant was "outgoing" and had "a good spirit." Tellado testified that defendant was not a typical gang member and he was not proud of it. Tellado said that defendant "knew it hurt him" and it "wasn't who he was." Defendant told Tellado he wanted to leave the gang, but he was afraid of being hurt through a violation.

Flores also asked defendant if he was in a gang after she saw a tattoo of two initials on his arm. She was very surprised because defendant "didn't carry himself as one." Defendant did not spend time with the gang because he was with Flores. Flores and defendant also discussed his desire to leave the gang and his fear of consequences. None of them ever saw defendant conduct gang business or bring a weapon into their home.

Ramos stated that defendant came to her and told her about his gang membership. She

said she was very upset and lectured him. Defendant told her he wanted to leave the gang. Ramos helped by keeping him occupied in the house. Ramos described defendant as "respectful, "honorable," and "would carry himself right."

Later, Tellado and his family moved to East Chicago, Indiana, and they invited defendant to move with him. Defendant did not want to leave his family. Tellado stayed behind to finish school and lived with defendant for a few months after Tellado's family left Chicago. Flores said that defendant would often visit her family in Indiana. Tellado stated that defendant was arrested within five to seven months after Tellado moved to Indiana. Flores testified that she continued to visit defendant while he was in prison and she said he has matured and that he "knows now there is more to life to offer him and he can actually reach out and could have [taken] it."

Defendant's mother, Aixa Martinez, also testified. She said that defendant's biological father was abusive and he left when defendant was two or three years old. Since then, she has been in a relationship with Michael Vera and she had two children with Vera. Martinez testified that she is epileptic and that defendant often helped her after her seizures by caring for his younger siblings. She trusted defendant with his siblings because he was a responsible kid and she knew he could handle it.

When Martinez found out that defendant was in a gang, they discussed it. She said he was not proud of being in a gang. It was hard for her to cope with it because defendant was not like gang members, in that, he was responsible and helpful. She talked with defendant about leaving the gang, but he was afraid of what might happen to his siblings and himself. Martinez helped defendant avoid the gang members by saying he was not at home when they came to look

for him. Defendant wanted to leave the neighborhood, but the family could not afford it.

Martinez said that defendant left the neighborhood twice. Once he went to Florida to live with Martinez's mother, but he returned after a few months because he missed his family. Later, defendant heard about the Lincoln's Challenge program from Tellado, which defendant attended. Defendant earned his GED there. Martinez said that it was defendant's idea to attend the program. Martinez also said that nothing happened to her family either time defendant left.

Dorothy Papachristos testified as a gang expert and she also had personal contact with defendant. Papachristos started a not-for-profit agency called Community Dare to Care, which aims to take kids out of gangs and reconnect them with their families. One program the agency offers is a gym program in which kids in gangs or at risk kids come in and play basketball two evenings a week. She met defendant through this program.

Papachristos also discussed the structure of the Latin Kings. She said that gang is very structured with a defined hierarchy with a cosinca and sinca at the top. The low members, foot soldiers, take instruction from higher-ranked members.

Papachristos was impressed with defendant because he came to her, introduced himself and shook her hand. Defendant seemed to be a peace maker. She said if a fight broke out at the gym, defendant would try to help her calm it down. Papachristos found defendant's behavior to be different than typical gang members in the program. She said that other gang members were "really aggressive" and "tried to, you know, conduct gang business in front of [her]." Defendant, in contrast, never behaved that way. She discussed defendant's desire to leave the gang with him, but he was afraid for his family. Papachristos said that was a reasonable fear. She also

stated that defendant leaving to go to Florida for a few months and his participation in Lincoln's Challenge was not sufficient to leave the gang. She testified that defendant was not successful in leaving the gang because he was not "strong enough."

Papachristos also saw defendant outside of the gym program. He befriended one of her foster sons and he spent time at her house. She said defendant always made it a point to clean up after himself and to help in whatever way he could.

Papachristos has visited defendant in prison and said that he has matured. He left the Latin Kings while in prison. She believed he could be rehabilitated. Papachristos admitted that she had not discussed the specifics of the offense with defendant, but reiterated that she thinks he can be rehabilitated.

Dr. Ruben Gur testified that he is a neuropsychologist. He offered expert testimony about how brain development impacts behavior. Dr. Gur discusses how parts of the brain develop at different rates. According to Dr. Gur, the frontal lobe is responsible for integrating "all the information in relation to the context." When other parts of the brain react to an outside event, the frontal lobe will put that initial reaction into the context of the situation. A process called myelination occurs to enhance brain function by increasing the speed in which impulses travel throughout the brain. Dr. Gur said that babies have no myelin in their brains and as a result the signals for reaction dissipate and babies cannot control their responses. Myelination occurs throughout all parts of the brain with the frontal lobe developing last.

Dr. Gur testified about several studies that have been conducted to study myelination in the brain. In the studies, it was shown that myelination is not completed in the frontal lobe until

the "third decade of life," or around age 22. Dr. Gur stated that in adolescents the result is that they will act on impulse, but after their actions, they will be able to understand what was wrong about their actions. The frontal lobe is not able to put the impulsive actions into context fast enough.

Dr. Gur admitted that he never studied defendant's brain. He said that these findings about brain development are generally accepted in his field with "very little disagreement, if any." Dr. Gur said that with adolescents, they have a hard time changing their course of action because they are not able to understand the full context and the frontal lobe is not fully able to provide that context. Dr. Gur stated that he gave a presentation on adolescent brain development before the American Bar Association in Washington, D.C., and his opinion at trial was the same as it was in the presentation.

Additionally, defendant offered affidavits from nine other family members and friends. These affidavits also described defendant as a respectful and polite teenager and not a typical gang member. Defendant tried to keep his younger brother and other friends from joining a gang. These family members and friends also stated that defendant wanted to leave the gang, but was afraid.

Finally, defendant gave the following statement of allocution.

> "My reason for standing here today, You Honor, because I
> want to take this opportunity which I think, I wish I had said a long
> time ago. But honestly didn't have the courage to. To Mrs.
> Soberon, I told you how sorry I am for causing you and your family

so much pain through the years. I don't want you to think the one reason I'm standing here pretending how I understand what it feels like to lose a child because I don't. I wish I had sorry words to say to you. But I want you to know, I didn't mean for this to happen. And I know that by me telling you how sorry I am isn't enough to make you — not bring your son back to you. But I do hope from my words somehow play a part in helping you find a piece [*sic.*] within that you can lead because I am sorry. I'm so sorry for the trauma I gave you. I really am. I really am.

I'd like to apologize to my family and friends, especially my daughter.

I'm sorry, Your Honor, to Mrs. Soberon, I am so sorry. I wanted to tell you I'm sorry. Thank you."

The State did not present any live testimony at the sentencing hearing. The State offered a victim impact statement from Soberon's mother and the presentence investigation. According to the presentence investigation, defendant's only prior conviction was for disorderly conduct and he was fined $71.

In making its ruling, the trial court discussed defendant's decision to join a gang and his decision to participate in the shooting death of Soberon. The court noted that defendant had supportive family and friends, and yet he still chose to be in a gang. The court recognized that the mitigating evidence indicated that defendant wanted to leave, but feared repercussions.

34

However, the court considered it and found defendant did walk away from the gang and nothing happened to him. The court stated that "[t]here was no hard evidence that he was in fear for his life." The court found that defendant did well in the structured environment of Lincoln's Challenge, but once outside of that environment he went back to the gang and committed murder. The court concluded that defendant was someone who needed to be in a structured environment for a long time.

As for Dr. Gur's testimony, the trial court found it to be "very fascinating," but it had "very little value here" because the study had nothing to do with defendant. The court noted that the testimony of defendant's friends and family was that he was a mature and respectful person, which "really destroys any far fetched argument that he had a frontal lobe that wasn't developed." The court also found that Papchristos' "testimony wasn't very helpful in any way" other than the fact that defendant had a relationship with her and followed her rules. After discussing its thoughts on the evidence, the trial court sentenced defendant to a term of 44 years' imprisonment.

In People v. Brown, 243 Ill. App. 3d 170, 171 (1993), the defendant was charged with the first-degree murder in the shooting death of Stephen Anderson. One of the defendant's codefendants, Eric Langham, sold a car to the victim's brother, Jonathan Anderson, but they got into a dispute after the sale. Langham asked Jonathan to meet him to discuss the problem. The victim and two others came with Jonathan to meet Langham. Langham grabbed Jonathan by his neck and put a gun against his head. Brown, 243 Ill. App. 3d at 171-72. The victim began to approach when "gunfire erupted from several different places." Brown, 243 Ill. App. 3d at 172.

Multiple witnesses identified the defendant as one of the individuals seen firing a gun at the scene. Brown, 243 Ill. App. 3d at 172. The defendant was sentenced to a 45-year term of imprisonment. Brown, 243 Ill. App. 3d 173. On appeal, the reviewing court reduced the 45-year sentence to 20 years because the defendant was 20 years old at the time of the offense and lacked any prior criminal history. The court found that for these reasons the defendant's "rehabilitative potential was not adequately considered." Brown, 243 Ill. App. 3d at 176.

Similarly, in People v. Maldonado, 240 Ill. App. 3d 470, 473 (1992), the defendant was charged with the first-degree murder of Elizabeth Cooley. Cooley was a passenger in a car with four others. As they were driving, the car encountered Efrain Nunez, who was standing in the street. Nunez hit the roof of the car with his hand. The driver and two passengers got out of the car. Maldonado, 240 Ill. App. 3d at 473. One of the passengers testified that Nunez yelled something about the Latin Kings and then two individuals came out and joined Nunez. Maldonado, 240 Ill. App. 3d at 473. Then, another car arrived at the scene and the occupants joined the altercation on Nunez's side. The defendant was identified as one of the occupants of the car. Maldonado, 240 Ill. App. 3d at 474. The defendant pulled out a gun and confronted one of the passengers of the car. The driver got back in the car and started to drive. Three to seven gunshots were heard by various witnesses. According to witness testimony, the defendant was the only person with a gun. Maldonado, 240 Ill. App. 3d at 474. The two passengers got back into the car at stoplight and they noticed Cooley was bleeding. They took her to a hospital, where she later died. Maldonado, 240 Ill. App. 3d at 474. The defendant was sentenced to the maximum term of 40 years. Maldonado, 240 Ill. App. 3d at 474.

The defendant argued on appeal that the trial court abused its discretion in sentencing him to the statutory maximum. Maldonado, 240 Ill. App. 3d at 484. The defendant was 20 years old at the time of the offense, the father of two small children, engaged to the children's mother, had completed three years of high school, and had no prior felony convictions. Maldonado, 240 Ill. App. 3d at 484. The Maldonado court stated that "[a] sentence imposed for the offense of murder is as amenable to the scope of an appellate court's power of reduction as any other offense" and then referenced several prior decisions in which a defendant's sentence for murder was reduced on appeal. Maldonado, 240 Ill. App. 3d at 485, citing People v. Crews, 42 Ill. 2d 60, 66 (1969) (after noting that society is outraged by the murder of a child, the Illinois Supreme Court reversed the death penalty sentence and imposed a 20- to 35-year term of imprisonment on the defendant); People v. Wilkins, 36 Ill. App. 3d 761, 767 (1976) (the court reduced the penalty imposed by the trial court where the defendant was 17 years old, had no prior criminal record, was attending high school, and had the possibility of rehabilitation); People v. Mitchell, 12 Ill. App. 3d 960, 968 (1973) (after acknowledging that the defendant's "shooting the gun into the crowd of people cannot be condoned," the court reduced the defendant's sentence where he was 20 years old at the time of the offense and had a minimal prior criminal record); People v. Adams, 8 Ill. App. 3d 8, 13-14 (1972) (the sentence of an 18-year-old defendant who had three prior misdemeanor convictions was reduced after the court expressly "recognize[d] the heinous nature of the crime committed"). The reviewing court then reduced the defendant's sentence from 40 years to 20 years after concluding that "the circumstances revealed in this record do not justify the imposition of the maximum sentence allowed by statute." Maldonado, 240 Ill. App.

1-06-0768

3d at 486.

Here, defendant was 18 years old at the time of the offense, had received a GED, and had no prior felony convictions. Defendant presented extensive evidence in both live testimony and affidavits from family members, friends, and experts discussing his rehabilitative potential. Defendant was described as a respectful and polite young man who made a bad decision in joining a gang. Several people disclosed defendant's desire to leave the gang, but his fear of retribution from the gang against himself and his family kept him from leaving. Defendant offered the expert testimony of Papachristos to illustrate both defendant's atypical behavior for a gang member and the structure and circumstances of Chicago gangs. Dr. Gur testified about generally accepted studies involving the brain development in adolescents. Defendant also offered his own apologies to Soberon's family. The trial court dismissed the testimony of Dr. Gur and found that Papachristos did not offer anything helpful.

While we acknowledge that the 44-year sentence imposed was within the sentencing ranged allowed and we acknowledge the trial court's assessment that "[t]his was a cold-blooded attack on innocent individuals riding in a car by self-admitted gang members who laid in the weeds waiting for their prey to attack them," we find that the trial court did not fully consider the mitigating evidence presented at defendant's sentencing hearing, particularly in light of defendant's age and lack of any significant criminal background at the time of the murder. Accordingly, under the authority of Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we reduce defendant's sentence for murder from 44 years to 36 years.

For the foregoing reasons, the dismissal of counts I, II, and IV of defendant's

38

postconviction petition is affirmed and defendant's sentence is reduced to 36 years.

Affirmed as modified.

GARCIA and R. GORDON, JJ., concur.